**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:22-cr-20321-JEM/Becerra

UNITED STATES OF AMERICA,

v.

LORENZO GAROD PIERRE,

      Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE[1]**

      **THIS CAUSE** came before the Court on Defendant, Lorenzo Pierre's ("Pierre" or "Defendant"), Motion to Suppress Evidence (the "Motion"). ECF No. [15]. The United States of America (the "Government") filed a Response to Defendant's Motion, ECF No. [25]. The Court held an evidentiary hearing on this matter (the "Hearing"). ECF No. [42]. Following the Hearing, and as permitted by the Court, the Government filed its Supplemental Response, ECF No. [37], and Defendant filed his Supplemental Brief in Support of his Motion (Defendant's "Supplemental Reply"), ECF No. [43]. Upon due consideration of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that Defendant's Motion be **DENIED**. [2]

---

[1] The Honorable Jose E. Martinez, United States District Judge, referred this matter to the undersigned. ECF No. [18].

[2] At the Hearing, the Government withdrew its Opposed Motion to Exclude Testimony From State Prosecutor, ECF No. [31], and therefore, the motion is **DENIED AS MOOT**.

## I.      BACKGROUND

Defendant is charged in a one-count Indictment with "knowingly possess[ing] a firearm and ammunition in and affecting interstate and foreign commerce, knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1)[.]" ECF No. [3].  Defendant's arrest arose from a traffic stop conducted on June 2, 2022, during which officers frisked Defendant and recovered a firearm from a fanny pack he had been wearing.  *See* ECF No. [15].  Defendant moves to suppress the firearm and any statement made by Defendant during or after the pat-down.  *Id.*

## II.     FINDINGS OF FACT

At the evidentiary hearing, the Government called three witnesses: Detective Jose Lemus, Detective Carlos Cano, and Assistant State Attorney Isaac C. Glickfield.  Additionally, the Government admitted 6 exhibits into evidence.  Specifically, the Government admitted: Detective Lemus' and Detective Cano's body-worn camera video evidence, Govt. Ex. A, *see* ECF No. [40]; a photograph of the fanny pack Defendant was wearing, Govt. Ex. B, ECF No. [40-1]; the arrest report, Govt. Ex. C, ECF No. [40-2]; the citation issued to the driver of the vehicle for illegal tints on the side windows, Govt. Ex. D, ECF No. [40-3]; the citation issued to the driver of the vehicle for failing to stop at a stop sign, Govt. Ex. E, ECF No. [40-4]; the citation issued to Defendant for failure to wear a seatbelt, Govt. Ex. F, ECF No. [40-5]; and a still photo from one of the body cameras depicting Defendant as he exited the vehicle,  Govt. Ex. G, *see* ECF No. [42] at 48:24.

Defendant called ATF Agent Luis Arias to testify, and admitted 6 exhibits: the arrest report, Df. Ex.1, ECF No. [35-1] at 1–4; Detective Lemus' and Detective Cano's body-worn camera video evidence, Df. Exs. 2 & 3, ECF No. [35-1] at 5; the pretrial detention hearing transcript, Df. Ex. 4,

ECF No. [35-1] at 6–29; the "No Action Memo and True and Correct Letter," Df. Ex. 5, ECF No. [35-1] at 30–31; and the prefile conference notes, Df. Ex. 6, ECF No. [35-1] at 32–33.

Based on the testimony of Detective Lemus, Detective Cano, Assistant State Attorney Glickfield, and Agent Arias, all of whom the Court finds credible, and the other evidence submitted into the record, the Court finds as follows.

### A.    The Testimony of Detective Jose Lemus

Detective Lemus has worked for the City of Miami Police Department for about seven years, with two of those years in his current role as a detective with tactical robbery. According to Detective Lemus, his duties include traffic stops, the investigation of gun crimes, and locating and apprehending violent criminals. He testified that he has been involved in thousands of traffic stops where he found a gun. Detective Lemus testified that of the eleven zones that he patrols, Model City "in [his] experience . . . is one of the most dangerous net zones in the city. There is a lot of violent crimes there, a lot of shootings, a lot of illegal firearms in that net zone[,]" including "shootings that happen there towards police and then just gang-affiliated shootings[.]" ECF No. [42] at 7:11–22.

On June 2, 2022, Detective Lemus was working a violent crime detail from about 1:00 p.m. to 11:00 p.m. At approximately 9:30 p.m., Detective Lemus and Detective Cano conducted a traffic stop of the vehicle in which Defendant was a passenger. According to Detective Lemus, they stopped the car because the vehicle had "heavily dark tints" and failed to stop at a stop sign. *Id.* at 8:18–22. The Government played portions of Detective Lemus' body-worn camera video, Govt. Ex. A, *see* ECF No. [40]. Upon reviewing clips of the video, Detective Lemus testified that he approached the vehicle on the driver's side and saw three occupants: Defendant sitting in the front passenger seat, the driver, and a passenger in the back seat. Detective Lemus asked

Defendant and the driver for their identifications, which he testified is typical when he conducts traffic stops.  According to Detective Lemus, the driver provided his identification without issue but Defendant "was uncooperative" and "didn't want to identify himself."  *Id.* at 11:20–22.

Defendant eventually provided his social security number.  According to Detective Lemus, Defendant seemed nervous because he was "shaking and smoking."  *Id.* at 21:12–15.  Detective Lemus testified that he asked the occupants if there was anything illegal in the vehicle for purposes of officer safety, because they were in a "violent crime area" and he has encountered "a lot of illegal firearms" in his work.  *Id.* at 12:16–23.  Detective Lemus also testified that he could see that Defendant was wearing a fanny pack that was bulky or had a bulge and was "large enough to fit a firearm[,]" and that in his seven years in law enforcement, he has "come across a lot of firearms inside of fanny packs."  *Id.* at 13:3–10, 23:4–7.  Detective Lemus testified that he did not say "gun" or use a code to alert of a potential weapon, whether to Detective Cano or by radio, did not draw his own weapon, and did not ask the Defendant to step out of the vehicle.  He also testified that he did not indicate on the arrest form that he saw a bulge in Defendant's fanny pack when he first approached the vehicle.

Detective Lemus walked back to his vehicle and for three or four minutes, checked the identification and criminal history of the occupants of the vehicle while Detective Cano remained standing at the passenger side window of the vehicle.  When Detective Lemus ran Defendant's information, he discovered that Defendant "had been arrested for several violent crimes, and he was a convicted felon three times for armed robbery."  *Id.* at 14:21–23.  According to Detective Lemus, his "concern was high during this traffic stop" because he was in a violent crime area, saw the bulky fanny pack, and learned that Defendant had a criminal history.  *Id.* at 15:1–5.

Detective Lemus walked back to the vehicle.  He testified that he believed Detective Cano was on the passenger side of the vehicle because "[i]f you observe something that may be dangerous, you just keep an eye on their hands just for [officers'] safety and the community's safety." *Id.* at 12:9–16.  Once he walked back to the vehicle, Detective Lemus asked the driver if he had anything on him, and then "just to be sure, [he] did a pat-down search of him and his immediate vicinity." *Id.* at 15:21–24.

According to Detective Lemus, the driver consented to a search of his vehicle, so the officers asked the other occupants to get out of the vehicle so that they could safely search the car.  Detective Lemus walked around the vehicle and removed the juvenile passenger from the back seat and conducted a pat down.  Detective Lemus testified that he had safety concerns during the stop because he had encountered a lot of violent criminals in Model City, there were shootings that week, his partner was shot in Model City the previous year, and two months ago an officer was shot and killed in the area. *Id.* at 20:12–25.

While Detective Lemus was conducting a pat down on the juvenile passenger, Detective Cano removed Defendant from the vehicle.  Detective Lemus testified that he "observed [Defendant] was swaying his body in a defensive manner to hide the fanny pack." *Id.* at 16:18–19.  After patting down the juvenile passenger, Detective Lemus approached Defendant, whose back was turned to Detective Lemus while Defendant was facing Detective Cano.  Detective Lemus patted down the front of Defendant's waist.  According to Detective Lemus, he patted down Defendant's waist prior to patting down the fanny pack because he was trained to start from the waist and then move up.

Defendant then turned around and the fanny pack was visible to Detective Lemus.  Detective Lemus testified that Defendant was "kind of securing [the fanny pack]. He [didn't] want

us to remove the fanny pack from his person.  He was being defensive towards it." *Id.* at 18:1–3.
According to Detective Lemus, he believed there was possibly something illegal in the fanny pack.
*Id.* at 18:19–20.  He was "not totally sure what could be inside" at first "but then after learning
about [Defendant's] past criminal history, [and] his violent tendencies, then [he] was . . . almost
sure that there was going to be something illegal in the fanny pack" given his "previous experience
with fanny packs" and given that "there is a lot of firearms [he has] located inside of fanny packs."
*Id.* at 18:23–19:4.

While patting down the fanny pack, Detective Lemus asked Defendant to remove the fanny
pack and said to Defendant, "For my safety, man.  I don't know what you have in here." *Id.* at
35:20–23.  While Defendant acted defensively toward the fanny pack, Detective Lemus testified
that he tried "to grab his hands for him not to reach inside of the fanny pack because [he] felt what
seemed to be a metal L-shaped object inside of the fanny pack." *Id.* at 19:11–14.  Detective Lemus
was not surprised to learn that there was a firearm in the fanny pack because "it was bulky, [they]
were working in a violent crime area where [they have] located a lot of firearms, then his defensive
demeanor towards the fanny pack, and then after [he] touched it and felt the L-shaped metal object,
[he] was almost sure there was a firearm inside of the fanny pack." *Id.* at 20:1–9.

Detective Lemus testified that the case was first presented to the Miami Dade State
Attorney's Office and that he spoke with a prosecutor from that office during the "profile," which
is "a synopsis of the arrest and the charging documents," approximately one week after the arrest.
*Id.* at 26:14–17.  Detective Lemus recalled that he had a telephone conversation with the prosecutor
that lasted approximately three minutes, that they did not review the body-camera footage, and
that the prosecutor did not ask him about the fanny pack.  Detective Lemus testified that he learned
that the case was "no actioned" by the State Attorney's Office a couple of weeks after the arrest

when the owner of the recovered firearm e-mailed him asking for the firearm to be released. Detective Lemus testified that had not seen the No Action Memo prior to preparing for the Hearing and never saw the state prosecutor's profile notes.

**B.     The Testimony of Detective Carlos Cano**

Detective Carlos Cano has been employed with the City of Miami Police Department for approximately seven years.  He is currently a priority support detail, supporting high liability units, including the Tactical Robbery Unit.  He has been a detective for approximately one year. Detective Cano testified that his current duties include conducting traffic stops and that he "run[s] into guns every day, maybe one to three guns on traffic stops a day." *Id.* at 42:3–11.  According to Detective Cano, Model City is "one of [the] most problematic" areas he patrols and testified that he "recover[s] a lot of guns there" and there is "a lot of crime there, a lot of shootings" and that he "find[s] guns in most traffic stops in that area." *Id.* at 42:17–20.

The Government played portions of Detective Cano's body-worn camera video, Govt. Ex. A, *see* ECF No. [40].  Upon reviewing clips of the video, Detective Cano testified that during the traffic stop, he was next to the front passenger door.  According to Detective Cano, he was shining his flashlight inside of the vehicle while Detective Lemus was in his car running the occupants' identification because he wanted to ensure there were no weapons in the vehicle and that he could see everyone's hands, because they were in a high-crime area in which he had previously encountered guns.  He also asked if anyone had any weapons in the car after observing that Defendant had a fanny pack worn around his waist, because in his experience people usually place firearms in fanny packs, and because Defendant had been "kind of defensive" when asked to provide identification. *Id.* at 44:17–22, 45:15–16.  According to Detective Cano, he observed the fanny pack "maybe within 30 seconds to a couple of minutes into that stop[,]" at the time that he

asked if there were any weapons in the car.  *Id.* at 53:21–22.  Detective Cano testified that he specifically shone his flashlight on Defendant in order to see his hands and the fanny pack, sometimes moving so that he could better see because Defendant was his "biggest concern" and the fanny pack "looked full, so [he] wanted to be sure that [Defendant] wasn't going to reach for that[.]" *Id.* at 46:10–12, 47:20-21.  Detective Cano also testified that Defendant said that his phone did not work but then he saw that the phone did work, and it "showed [him] that [Defendant] was [lying] and he didn't want to provide identification." *Id.* at 47:1–2.  Detective Cano testified that he did not communicate his concerns that there may be a gun or draw his weapon or ask Defendant to move his hands.

Detective Cano testified that when Defendant exited the vehicle, "[h]is right hand [was] by the fanny pack.  He was adjusting the fanny pack." *Id.* at 49:17–18.  While Detective Cano testified that he wasn't a hundred percent sure there was a firearm" in the fanny pack prior to opening it, he testified that he was "suspecting [it] toward the entirety of the traffic stop." *Id.* at 51:22–52:1.  Detective Cano was not aware of Defendant's criminal history prior to uncovering the gun.

### C.    The Body-Camera Footage of Detective Lemus and Detective Cano

The body-camera footage shows the entirety of the traffic stop, which occurred in less than ten minutes.  The Government and Defendant each admitted into evidence and played portions of both Detective Lemus' and Detective Cano's body-camera video footage.  *See* Govt. Ex. A, ECF No. [40]; Df. Exs. 2 & 3, ECF No. [35-1] at 5.  At the beginning of the stop, Detective Lemus approaches the driver's side and ask the occupants of the vehicle for their identification.  Detective Cano approaches the passenger side of the vehicle.  He shines his flashlight on Defendant, angled towards Defendant's waist.  Detective Lemus then walks back to his car and spends approximately three-and-a-half minutes checking their identification.  Detective Cano remains by the front

passenger door while Detective Lemus is in his car, and Detective Cano tells the occupants that the officers stopped them for running a stop sign and failing to use their signal while turning.  A relative of one of the occupants comes out to the street and Detective Cano tells her they are almost finished.

Detective Lemus walks back to the driver's side and the driver steps out of the vehicle after consenting to a search.  Detective Lemus pats down the driver, walks behind the vehicle, and then pats down the minor passenger, on the other rear side of the vehicle.  As he is patting down the minor, Detective Cano asks Defendant to step out of the vehicle, and Defendant complies. Detective Cano tells Defendant he is going to do a quick pat-down, and then Detective Lemus turns to conduct a pat-down on Defendant, while Defendant's back is to him, reaching in front to first pat Defendant's waist.  Defendant moves and puts his hands on the fanny pack, seemingly attempting to block the officers from touching the fanny pack.  Detective Cano says, "send us a 15."  Detective Lemus grabs the fanny pack while it is still on Defendant, and the outline of a gun is visible.  Detective Cano then unclips the fanny pack.  Detective Lemus hands Detective Cano the fanny pack, saying, "check it."    Detective Cano then walks behind Defendant, and steps just feet away, as Detective Lemus holds one of Defendant's hands/wrists with one hand, and Defendant holds his cell phone in the other.  While Defendant is restrained only by Detective Lemus holding his hand, Detective Cano opens the fanny pack and announces that there is a weapon.  The body-camera footage is consistent with Detective Lemus' and Detective Cano's testimony.

### D.    The Testimony of Assistant State Attorney Isaac Glickfield

Assistant State Attorney ("ASA") Isaac Glickfield has worked as a prosecutor in the Miami-Dade State Attorney's Office for approximately three and a half years.  He currently works

in the Felony Screening Unit.  ASA Glickfield testified that he spoke to an officer about Defendant's felony case in the course of screening the case, but could not recall who, because he screens approximately fourteen cases each day.  Before making a decision to dismiss the case, ASA Glickfield did not have the body-camera footage.  ASA Glickfield testified that he knew he spoke with Detective Lemus based on reviewing his notes, but that he "[did not] personally remember the conversation otherwise."  ECF No. [42] at 68:24–69:3.  According to ASA Glickfield, he and his supervisors "did not believe this case was a provable one with the information that [they] had at the time" following his review and conversation with Detective Lemus, so he dismissed the case.  *Id.* at 70:4–6.  ASA Glickfield testified that he did not notify Detective Lemus that he was dismissing the case, and generally does not tell officers as a matter of course if he dismisses a case.  ASA Glickfield acknowledged that his no-action memo, Df. Ex. 5, ECF No. [35-1] at 30–31, was addressed to Detective Lemus, but testified that he prepares memos for his supervisor and in this case, was unsure whether the memo was actually forwarded to Detective Lemus.

E.    **The Testimony of ATF Agent Luis Arias**

Special Agent Luis Arias is an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") who also testified at the federal pretrial detention hearing in the instant case. At the federal pretrial detention hearing, Agent Arias testified that the prosecutor represented to the Court that, "the state no actioned the case because we federally indicted it -- or, excuse me, because we took the case so that's the reason for that." *Id.* at 83:17–19.  However, Agent Arias also testified that he did not recall why the State Attorney's Office did not prosecute this case.

### III.    ANALYSIS

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'" *United States v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV).   "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

As an initial matter, Defendant does not challenge the officers' stop of the vehicle, nor removal of the occupants from the vehicle given the driver's consent to search it.  *See* ECF No. [42] at 102:24–103:2.  The issue at hand is whether the officers violated Defendant's Fourth Amendment rights when they patted him down for weapons.  It is well settled that an officer may "frisk a legally detained individual for weapons if he reasonably believes that his or others' safety is threatened." *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Indeed, *Terry* frisks permit officers "to conduct a limited search of the outer clothing of a passenger in vehicle during a traffic stop if the officer has a reasonable suspicion that the passenger may be armed and dangerous." *United States v. Tinker*, 618 F. App'x 635, 636–37 (11th Cir. 2015) (citing *Arizona v. Johnson,* 555 U.S. 323, 327 (2009)).  Reasonable suspicion is an objective standard.  *See Bishop*, 940 F.3d at 1248–49 ("Reasonable suspicion that an individual is armed and dangerous exists so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'") (quoting *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)); *United States v. Robinson*, 515 F. Appx. 790, 791–92 (11th Cir. 2013) ("[A]n officer's subjective intentions or

beliefs are immaterial" because "[w]hether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene.").

In determining whether reasonable suspicion exits, courts "evaluate the totality of the circumstances surrounding the stop, including the collective knowledge of all officers involved in the stop." *Bishop*, 940 F.3d at 1249 (citing *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983)). Officers' collective knowledge may be considered "so long as the officers 'maintained at least a minimal level of communication during their' operation." *United States v. Ingram*, No. 18-cr-00044, 2020 WL 6136747, at *5 (N.D. Fla. Oct. 19, 2020) (citing *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)). Moreover, "[t]he officers with the actual knowledge giving rise to reasonable suspicions need not have communicated that knowledge to the detaining officer for the collective knowledge doctrine to apply." *Id.* (citing *United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985)). Rather, the "'minimal communication' requirement is met where law enforcement officers are functioning as a team and one officer asks or instructs another officer to take some action." *Id.* (citing *Cotton*, 721 F.2d at 351–52).

**A.**   **The Officers' Frisk Of Defendant Was Lawful Because They Reasonably Believed That Defendant Was Armed And Dangerous.**

There is no dispute as to the applicable legal standard: the officers needed reasonable suspicion that Defendant was armed and dangerous to justify the frisk of Defendant. Defendant's argument that the officers lacked such reasonable suspicion largely turns on Defendant's contention that the officers were not credible. Specifically, Defendant takes issue with the fact that there is no evidence that the officers noted their suspicion that the fanny pack contained a gun when they presented the case to the State Attorney's Office, and inconsistencies with the Government's written filings in this case noting that the officers believed there was a "bulge" in the fanny pack and the officers' testimony referring to a "bulky" fanny pack. Defendant also

contends that the officers' conduct undermines their testimony, including that Detective Lemus left Detective Cano alone with Defendant while he checked identification, that neither officer radioed for help or used codes to communicate a potential weapon to one another, and the manner in which all occupants were pulled out of the vehicle and searched.  Additionally, Defendant contends Detective Lemus could not have seen Defendant act uncooperative or protectively toward the fanny pack while exiting the vehicle because Detective Lemus was patting down the minor passenger at that point, and then Defendant's back was to Detective Lemus, with the fanny pack in front of Defendant.

The Government responds that the officers observed Defendant touching the fanny pack, which the officers described as bulky, as he exited the vehicle, which the Government argues is sufficient, alone, to justify reasonable suspicion.  However, the Government also contends that a number of factors further support reasonable suspicion, including: (1) the stop occurred in a high crime area; (2) Defendant was uncooperative; (3) the officers were outnumbered; (4) Defendant appeared nervous based on the fact that he was smoking; (5) Defendant's violent criminal history; and (6) officers saw that the fanny pack seemed to have something inside and had experience finding guns in fanny packs.

Based on the undersigned's review of the record, the Court finds that the officers had reasonable suspicion, based on the totality of the circumstances, that Defendant was armed and dangerous, and therefore, the frisk comported with the Fourth Amendment.  As an initial matter, the undersigned considers Defendant's argument that the officers' testimony was not credible. Defendant posits that the police provided different information to the State Attorney as to what they observed, and that after the case was dismissed by the State Attorney the officers provided different information to the United States Attorney's Office in order to have the case prosecuted.

There is simply insufficient evidence in this record to support Defendant's theory. Indeed, the State Attorney had no recollection as to what he was told by the officer at the profile meeting, nor is there any evidence as to who presented the case to the United States Attorney's Office for federal prosecution. The fact that one office declined to prosecute and another did prosecute is not sufficient to undermine the credibility of the officers given that a number of factors could have led to this, including the fact that the State Attorney did not have the body-camera evidence. As to the fact that the representation made at the bond hearing concerning the basis for the State's dismissal was wrong, that issue is one to be raised as to his detention and does not bear on the credibility of the officers or the issues before the Court now. Finally, based on its review of the body camera footage, the Court does not find that any discrepancy, to the extent there was one, between describing the fanny pack as "bulky" as opposed to having a "bulge," is significant in this case. The officers testified clearly and consistently at the hearing that the bag was bulky, and that they believed it contained a firearm. As such, the Court finds that the officers' testimony was credible.

While the undersigned is not persuaded by the Government's contention that Defendant smoking indicates that he was nervous, or that Defendant was uncooperative by stating he believed his rights were being violated, or the argument that the fact that the officers were outnumbered supports reasonable suspicion that Defendant was armed and dangerous, the Government cites to other factors that support the officers' reasonable suspicion. Specifically, the officers were in a high-crime neighborhood, had encountered guns in fanny packs, and Defendant, who they knew had a violent criminal history that included firearms, was clearly touching the fanny pack as if to protect or grab it. In addition, the fanny pack appeared bulky, as it might be if a weapon were inside.

The facts of this case are closely aligned to those in *United States v. Tinker*, where the Eleventh Circuit found that there was reasonable suspicion that a defendant was armed and dangerous where the traffic stop occurred "in a high-crime area" and defendant "appeared nervous, muttered, and would not make eye contact, his right hand was shaking, and his left hand appeared to be holding an object in his waistband." 618 F. App'x 635, 636–37 (11th Cir. 2015). Once the defendant stepped out of the vehicle, the defendant "adjusted the object in his waistband as if to secure it" and the officer "immediately ordered [the defendant] to face the vehicle and place his hands on it" so that the officer could conduct a pat-down search. *Id.* at 637. The officer recovered a firearm during the pat-down. *Id.* A similar conclusion was made in *United States v. Durrah*, 384 F. App'x 970, 972 (11th Cir. 2010), where the Eleventh Circuit found that "[t]he officers had reason to believe [defendant] was armed and dangerous, as [defendant] made a furtive movement with his right hand towards his hip and did not immediately comply with . . . orders to show his hands." Under those circumstances, "it was permissible for the officers to order [defendant] out of the vehicle and to conduct a pat-down search of his person for weapons." *Id. See also Bishop*, 940 F.3d 1249 ("Viewed in totality, Bishop's known criminal history, non-compliance, argumentativeness, and nervous, agitated behavior following lawful orders to exit the truck would cause a reasonably prudent officer in the circumstances to believe that his safety or that of his fellow officers was in danger."). Given the totality of the circumstances, the Court finds that the officers had reasonable suspicion to frisk Defendant.

**B.    Detective Cano Lawfully Opened and Searched The Fanny Pack In The Course Of The *Terry* Frisk Because The Officers Reasonably Believed The Fanny Pack Contained A Weapon.**

Even if the frisk of Defendant was lawful, the question remains whether Detective Cano lawfully opened and searched the fanny pack after it was removed from Defendant's body. The undersigned raised this issue at the Hearing and permitted the Parties to submit additional briefing

on this issue.  In its Supplemental Response, the Government sets forth two alternative bases for the search of the fanny pack.  *See* ECF No. [37].  First, the Government contends that if probable cause was needed to search the fanny pack, Detective Lemus had probable cause "once [he] felt the L-shaped object and determined that it was likely a gun[.]"  *Id.* at 4.  Because of the collective knowledge doctrine, the Government contends Detective Cano also had probable cause to conduct the search.  *Id.* at 4–5.  Second, the Government cites to *United States v. Rhind*, 289 F.3d 690, 693–94 (11th Cir. 2002), in support of the proposition that the officers needed only reasonable suspicion to search the fanny pack, because officers may open and search a bag where "the officers ha[ve] a reasonable, articulable suspicion, based upon objective facts, that the bag might contain a weapon or other contraband."  *Id.* at 1 n.1 (quoting *Rhind*, 289 F.3d at 694).

In the Supplemental Reply, Defendant contends that the warrantless search of the fanny pack was unlawful because once the fanny pack was removed from Defendant, there was no longer any risk of safety or destruction of evidence, nor any other exigent circumstance justifying an exception to the need for a warrant.  ECF No. [43] at 1–2.  Defendant argues that "'[t]he sole justification' for a *Terry* frisk is 'the protection of police officers and others nearby'" and "[a]ny such interests present in this case ceased to exist once the fanny pack had been removed from Mr. Pierre's waist by police."  *Id.* at 3 (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968)).  Likewise, Defendant argues there was no exigency exception because "once the item to be searched was 'safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant.'"  *Id.* (quoting *United States v. Chadwick*, 433 U.S. 1, 13 (1977)).  Defendant contends the body camera footage supports a finding that there was no safety or exigency concerns, because "he was not reaching or lunging for" the fanny pack and "Detective

Cano took it several feet away from Mr. Pierre to search it, while leaving Officer Lemus standing with an unarmed Mr. Pierre." *Id.* at 4.

Based on the Court's review of the controlling precedent in this Circuit, only reasonable suspicion was needed to open the fanny pack.  In *United States v. Rhind*, officers received information that a group of men were staying in a motel and had a stolen vehicle and counterfeit currency.  289 F.3d at 692.  The officers arrived at the motel and asked the men, by telephone, to leave their room.  *Id.*  As they left the room, officers observed that one of the individuals was carrying a "black, zippered, soft-sided bag or backpack." *Id.* at 692–93.  The officers detained and handcuffed the men and one officer looked inside the bag and saw money and syringes.  *Id.*  The Eleventh Circuit found that the search of the bag was permitted under *Terry*, noting that the officer had probable cause at the time he searched the bag *but also* "based on the totality of the circumstances, the officers had a reasonable and objective suspicion that [the man with the bag] was involved in criminal activity" and "a reasonable articulable suspicion, based upon objective facts, that the bag might contain a weapon or other contraband." *Id.* at 693–94.

In a more recent case within this District, the Court applied *Rhind*.  *See United States v. Morrow*, No. 16-cr-20854, 2017 WL 457100, at *10 (S.D. Fla. Jan. 20, 2017), *report and recommendation adopted*, No. 16-cr-20854, 2017 WL 464381 (S.D. Fla. Feb. 1, 2017).  In *Morrow*, officers conducted a *Terry* stop of the defendant in a high-crime area, at a store at which one of the officers "previously investigated violent crimes and drug activity[.]" *Id.* at *2.  When the officer approached the defendant, "he made eye contact with [the defendant], who then turned his body to the side, reached to his left side, grabbed a brown bag from his side and tossed it on top of a shelf above the coolers." *Id.* at *3.  The officers retrieved the bag, found narcotics, and arrested the defendant.  *Id.*  The Court found that the officers were permitted to search the bag that

the defendant had thrown "to a location 'where he . . . *could retrieve it*'" because the officer "had grounds to search the bag for officer safety even before he arrested" the defendant.  *Id.* at *10 (emphasis in original).  *See also United States v. Bennett*, 555 F.3d 962, 966 (11th Cir. 2009) ("Agents may search for weapons within range of a person's 'immediate grasp' even when they are not in the process of conducting a lawful arrest, but only based on reasonable suspicion that the person poses a danger to the agent.") (citing *Michigan v. Long,* 463 U.S. 1032, 1049–52 (1983)); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989) ("Because the detective had reasonable suspicion to stop the appellant, she also had the right to make a limited protective search for concealed weapons in order to secure the safety of herself and the safety of those around her" such that "a limited protective search, including a search of the purse, was reasonable.").

Here, the officers reasonably suspected that the fanny pack contained a firearm, as supported by their testimony, the body-camera footage, and the still photograph of the body-camera footage, *see* ECF No. [37] at 3.  Although the fanny pack was removed from Defendant before Detective Cano opened the bag, the potential danger to officers that Defendant was armed and dangerous did not dissipate when the fanny pack was removed.  While Defendant seeks to characterize his ability to grab the weapon as implausible based on the fact that Detective Lemus was restraining Defendant with his hands and that Detective Cano stepped away with the bag, the undersigned is not persuaded that Defendant could not have reached the bag.  Defendant was not handcuffed and was not otherwise restrained or detained.  Moreover, the pat-down, removal of the fanny pack, and opening of the fanny pack were nearly instantaneous.  If Defendant been handcuffed or had the bag been taken away and searched at a much later time, the analysis may be different.  But here, Defendant was still within reach of the fanny pack, and officers had reasonable suspicion that the fanny pack contained a gun.  Indeed, Detective Lemus testified that "after [he]

touched it and felt the L-shaped metal object, [he] was almost sure there was a firearm inside of the fanny pack." ECF No. [42] at 20:7–9.  Because the officers had reasonable suspicion that the fanny pack contained a firearm, the search of the fanny pack was lawful.

## IV.     CONCLUSION

For the reasons set forth above, it is hereby **RECOMMENDED** that Defendant's Motion, ECF No. [15], be **DENIED**.

## V.     OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, within **SEVEN** calendar days of being served with the Report and Recommendation.  The parties were given ample time to argue their positions at the Hearing, as well as the opportunity to submit supplemental briefing, and the shortened period will allow for the District Court to consider the matter before the Calendar Call now set for December 1, 2022.  Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on November 21, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**