## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cr-20321-JEM/Becerra

UNITED STATES OF AMERICA,

v.

LORENZO GAROD PIERRE,

     Defendant.

_____/

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS INDICTMENT UNDER SECOND AMENDMENT[1]

**THIS CAUSE** came before the Court on Defendant, Lorenzo Pierre's ("Pierre" or "Defendant"), Motion to Dismiss Indictment Under Second Amendment (the "Motion"). ECF No. [16]. The Government filed a Response, ECF No. [23], and Defendant filed a Reply, ECF No. [27]. The Court permitted the Parties to submit additional briefing, and the Government filed its Sur-Reply, ECF No. [39], and Defendant submitted his Response to the Sur-Reply (the "Supplemental Response"), ECF No. [44]. The Court also held oral argument on the Motion (the "Hearing"). ECF No. [45]. After the Hearing, the Government filed a Notice of Supplemental Authority, citing a recent Third Circuit Court of Appeals case affirming the constitutionality of Title 18, United States Code, Section 922(g)(1), the same issue raised in the Motion: *Range v. Attorney General United States of America*, No. 21-2835, 2022 WL 16955670, at *1 (3d Cir. Nov. 16, 2022). ECF No. [49]. Defendant filed a Response to the Government's Notice of Supplemental Authority. ECF No. [52]. Upon due consideration of the Motion, the pertinent portions of the record, and being otherwise

_____

[1] The Honorable Jose E. Martinez, United States District Judge, referred this matter to the undersigned. ECF No. [18].

fully advised in the premises, it is hereby **RECOMMENDED** that Defendant's Motion be **DENIED**.

## I.        PROCEDURAL AND LEGAL BACKGROUND

Defendant is charged in a one-count Indictment with "knowingly possess[ing] a firearm and ammunition in and affecting interstate and foreign commerce, knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1)[.]" ECF No. [3]. The Indictment also includes a forfeiture count. *Id.* Defendant brings the instant Motion seeking dismissal of the Indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See* ECF No. [16]; *see also* ECF Nos. [27], [44]. Because the adjudication of this Motion is rooted in the Supreme Court's recent decision in *Bruen*, as well as its decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and the Eleventh Circuit's decision in *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010), we begin first with a short review of those decisions.

In *Heller*, the Supreme Court undertook its "first in-depth examination of the Second Amendment." *Heller*, 554 U.S. at 635. At issue was the constitutionality of the District of Columbia's ("D.C.") ban on the possession of handguns in the home. *Id.* at 573. The respondent in *Heller* was a D.C. law enforcement officer who was permitted to carry a handgun while on duty but was not permitted to register or keep a handgun in his D.C. home. *Id.* at 575–76. The Supreme Court held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595. In so holding, the Supreme Court first analyzed the plain language of the text of the Second Amendment. *See id.* at 576–600. In finding that the Second Amendment secures an individual right to bear arms for self-defense, and not just for use

2

in a militia, the Court considered that "the inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628.

The Court proceeded to look at "the historical background of the Second Amendment . . . because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right", and proceeded to review the Second Amendment's historical roots. *Id.* at 592. The Court found that the right to possess a firearm for self-defense in the home "is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment." *See id.* at 600–01. In doing so, the Court looked to "a variety of legal and other sources[,]" including post-ratification commentary, pre-Civil War case law, post-Civil War legislation, and post-Civil War commentary in order "to determine *the public understanding* of [the] legal text in the period after its . . . ratification." *Id.* at 605–19 (emphasis in original). The Court's historical review found that "virtually all interpreters of the Second Amendment in the century after its enactment interpreted the Amendment" consistently with how the Court interpreted it in *Heller*. *Id.* at 605. Specifically, based on its textual and historical analysis, the Court concluded that the District of Columbia's ban on the possession of handguns in the home violated the Second Amendment. *Id.* at 635. The Supreme Court cautioned, however, that "the right secured by the Second Amendment is not unlimited" and while the Court did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment, nothing in [the *Heller*] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* at 626.

In the years following *Heller*, federal district and circuit courts around the country began to consider gun regulations using the framework laid out by Justice Scalia in the *Heller* majority opinion. However, as discussed below, some courts also added a means-ends approach in weighing

whether the disputed gun regulation was constitutional, under which "[a]t the first step, the government may justify its regulation by "establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood" and at the second step, the courts would analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Bruen*, 142 S. Ct. at 2126.  Relevant to the issue at hand is the Eleventh Circuit's post-*Heller* decision in *Rozier*, where the Court considered the very issue raised in this Motion: the constitutionality of Section 922(g)(1).  *See Rozier*, 598 F.3d at 769.  In *Rozier*, the defendant had previously been convicted of felony drug charges at the time that he became involved in a domestic dispute where he "pull[ed] out a handgun[,]" leading to his indictment and conviction for possession of a firearm and ammunition by a convicted felon, in violation of Section 922(g)(1).  *Id*. at 769–70.  Rozier challenged his conviction by arguing that Section 922(g)(1) violated his Second Amendment rights, because, like the defendant in *Heller*, Rozier possessed the handgun "in the home and for the purposes of self-defense." *Id.* at 770.

The Eleventh Circuit held that, even taking as true Rozier's assertion that he possessed the handgun for self-defense, the Court must first "determine whether he is qualified to possess a handgun." *Id.* at 770–71.  The Eleventh Circuit reasoned that "Rozier's Second Amendment right to bear arms is not weighed in the same manner as that of a law-abiding citizen, such as the appellant in *Heller*." *Id.* at 771.  In support of its reasoning, the Court cited to the Supreme Court's reference to individuals "disqualified from the exercise of Second Amendment rights" and to the assertion that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* (quoting *Heller*, 554 U.S. at 626, 635).  The Eleventh Circuit read this language to "suggest[] that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id.*  Thus, the Eleventh

Circuit found that Section 922(g)(1) was a "constitutional avenue to restrict the Second Amendment right of certain classes of people[,]" such as felons, regardless of whether they possessed the handgun for self-defense.  *Id.*

This year, in *Bruen*, the Supreme Court addressed the constitutionality of New York's firearm licensing statute (the "New York Law"), which "condition[ed] issuance of a license to carry [a handgun] on a citizen's showing of some additional special need" beyond general self-defense. *Bruen*, 142 S. Ct. at 2122.  The Supreme Court held that the Second Amendment protected "an individual's right to carry a handgun for self-defense outside the home" and found New York's law unconstitutional in that it required this additional showing of special need.  *Id.*  In so holding, the Supreme Court clarified the standard set forth in *Heller* and rejected the reasoning of Courts of Appeals that, after *Heller,* had adopted a two-step test combining history with means-end scrutiny. *See id.* at 2129–30, 2134.  The Court "made the constitutional standard endorsed in *Heller* more explicit," and specifically directed courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.  *Id*. at 2126, 2134. Specifically, and unequivocally, the Court:

> reiterate[d] that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (citation omitted). The Supreme Court acknowledged that the "historical inquiry that courts must conduct will often involve reasoning by analogy" and that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a

determination of whether the two regulations are 'relevantly similar.'"  *Id.* at 2132 (citation omitted).

In striking down the New York Law, the Court first turned to the text of the Second Amendment.  *Id.* at 2134.  The Court reasoned that the petitioners in the case were "ordinary, law-abiding, adult citizens" who "are part of 'the people' whom the Second Amendment protects" and that handguns are indisputably "weapons 'in common use' today for self-defense."  *Id.*  Accordingly, the Court found that the conduct at issue, publicly carrying handguns for self-defense, is protected by the plain text of the Second Amendment, as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."  *Id.*  Moreover, the Court concluded that the "definition of 'bear' naturally encompasses public carry" since "[m]ost gun owners . . . . do not 'bear' (*i.e.*, carry) [firearms] in the home beyond moments of actual confrontation."  *Id.*

The Supreme Court then turned to the issue of whether the respondents could show that New York's regulation was "consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2135.  The Court noted that respondents cited to a range of "historical sources from the late 1200s to the early 1900s[,]" including: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries."  *Id.* at 2135–36.  The Court noted that "not all history is created equal" and historical sources from the time of the Second Amendment's ratification are most relevant because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."  *Id.* at 2136 (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35).  In weighing the historical record, the Court first cited to the 1328 Statute of Northampton, for which the respondents "argue[d] that the prohibition on 'rid[ing]' or 'go[ing]' . . . armed' was a sweeping

restriction on public carry of self-defense weapons that would ultimately be adopted in Colonial America[.]" *Id.* at 2139. The Court found that the law "has little bearing on the Second Amendment adopted in 1791" as it "was enacted . . . more than 450 years before the ratification of the Constitution" and the statute "obviously did not contemplate handguns, given they did not appear in Europe until about the mid-1500s." *Id.* at 2139–40.

Second, the Court noted that "the respondents point to only three restrictions on public carry[,]" which the Court doubted "could suffice to show a tradition of public-carry regulation." *Id.* at 2142. Instead, the Court found that "[f]ar from banning the carrying of any class of firearms, [the cited regulations] merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Id.* at 2143. Although respondents cited to one 1686 East New Jersey law restricting farmers or plantation owners from "concealed carry of 'pocket pistol[s]' or other 'unusual or unlawful weapons,'" the Court found that this single law did not carry much weight in the analysis because the law did not prohibit guns for self-defense. *Id.* at 2143–44. The Court also found that three late-18th-century and early-19th-century statutes were not persuasive because they "parallel[ed] the colonial statutes already discussed[.]" *Id.* at 2144.

Next, the Court considered respondents' citation to public-carry restrictions that arose after the Second Amendment was ratified—specifically, common-law offenses, statutory prohibitions, and "surety" statutes. *Id.* at 2145. The Court found that "[n]one of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime." *Id.* Additionally, the Court noted that sources around the time that the Fourteenth Amendment was adopted similarly did not support a finding that New York's law was consistent with historical tradition. *See id.* at 2150–53.

7

Finally, as to the "slight uptick in gun regulation during the late-19th century—principally in the Western Territories[,]" the Court found that such sources were not persuasive because not only were they not temporally close to ratification, but the regulations were also inconsistent with the "overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Id.* at 2153–54. Ultimately, "[a]t the end of [a] long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents [did] not me[et] their burden to identify an American tradition justifying" New York's special need requirement because "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. The Court concluded that although the historical record supported some restrictions around the "intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms[,]" there was insufficient support for a broad prohibition like that which the New York regulation imposed. *Id.*

"[A]s other districts have recognized, '*Bruen* transformed and left uncharted much of the legal landscape.'" *United States v. Price*, No. 22-cr-00097, 2022 WL 6968457, at *2 (S.D.W. Va. Oct. 12, 2022) (quoting *United States v. Charles*, No. 22-cr-00154, 2022 WL 4913900, at *1 (W.D. Tex. Oct. 3, 2022)). "[T]he critical question lower courts now face is whether *Bruen* requires the regulatory landscape be trimmed with a scalpel or a chainsaw . . . how strict—or loose—an interpretation *Bruen* requires hasn't been clarified, leaving important questions." *United States v. Perez-Gallan*, No. 22-cr-00427, 2022 WL 16858516, at *13 (W.D. Tex. Nov. 10, 2022). Indeed, as district courts around the country begin to grapple with *Bruen* and the standard that it requires the government to meet in defending its gun regulations, there appears to be no district court in this Circuit that has yet issued a written decision on *Bruen's* application to Section 922(g)(1). As for

circuit courts, the Third Circuit Court of Appeals is the only one that has squarely addressed *Bruen*'s application to Section 922(g)(1), finding the prohibition of felons from possessing firearms constitutionally permissible. *Range*, 2022 WL 16955670, at *1.

## II.    THE INSTANT MOTION

Defendant contends that given *Bruen*'s analysis, "rooted in the Second Amendment's text, as informed by history[,]" the Court must find that Section 922(g)(1) is unconstitutional. ECF No. [16] at 5. Defendant contends that "the Second Amendment's plain text covers [the defendant's] conduct" because: (1) he is among "the people" protected under the Second Amendment, as he is a United States citizen and the Second Amendment "does not draw a felon/non-felon distinction"; (2) the right to "keep" and "bear" refers to the right to possess, at home and in public; and (3) "arms" includes a handgun and ammunition. *See id.* at 5–10. Moreover, Defendant argues that Eleventh Circuit authority, including *Rozier* and *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022), supports a finding that felons are among "the people" protected by the Second Amendment. *See* ECF No. [27] at 16–18.

Defendant contends that because he is indisputably part of "the people," the Government bears the burden to show that Section 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." ECF No. [16] at 9–10 (quoting *Bruen*, 142 S. Ct. at 2126). Defendant argues that the Government cannot meet its burden because Section 922(g)(1) is inconsistent with that historical tradition. *Id.* at 10. Specifically, Defendant argues that under *Bruen*, the Court may only look to "distinctly similar" historical regulations, rather than analogous regulations, because the "general societal problem" here—the possession of guns by felons—is longstanding, as opposed to a newer concern unimaginable at the time of the country's founding. *See id.* Additionally, Defendant argues that it is the Government's burden to demonstrate that history of regulation,

dating from the time the Second Amendment was ratified, and that courts are not to undertake their own analysis. *See id.* at 11–12, 14. According to Defendant, there is no evidence of "distinctly similar regulation" to Section 922(g)(1)'s felon firearm prohibition at the time of the Second Amendment's ratification, and as such, the Government cannot meet its burden. *Id.* at 18.

The Government responds that notwithstanding *Bruen*, the decisions in *Heller* and *Rozier* dictate that Defendant's Motion should be denied. *See* ECF Nos. [23], [39]. Specifically, the Government argues that *Heller* "expressly constrained the constitutional right [to bear arms] so as not to upset certain longstanding prohibitions on either the manner of possessing and selling firearms or the classes of persons who could do so, such as convicted felons like the Defendant." ECF No. [23] at 2 (citing *Heller*, 554 U.S. at 626). The Government contends that the Supreme Court's language in *Heller* that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" resolves the "threshold question" of *Bruen*, namely "whether 'the Second Amendment's plain text covers an individual's conduct.'" ECF No. [39] at 1–2 (citations omitted) (emphasis omitted).

Second, the Government argues that the Eleventh Circuit's decision in *Rozier*, which held that felons were not "qualified to possess a firearm" because they "categorically were a 'certain class[] of people' whose firearm possession was not protected," is still binding precedent and is controlling. *Id.* at 2 (quoting *Rozier*, 598 F.3d at 770–71) (emphasis removed). According to the Government, *Bruen* "merely extend[ed] the logic" of *Heller*, ECF No. [23] at 3, and neither overruled nor "undermined . . . to the point of abrogation" *Rozier* because "the only 'people' *Bruen* held were protected by the Second Amendment were 'law-abiding citizens.'" ECF No. [39] at 2–3. Moreover, the Government argues that the Eleventh Circuit did not apply the means-end test that was specifically rejected in *Bruen*, such that *Bruen* "in no way undermines *Rozier*." *Id.* at 3.

In short, the Government contends that "*Bruen* simply has no bearing on the case against the Defendant, and therefore, this Court need not address the two-step analysis outlined therein, on which the Defendant places such heavy reliance." ECF No. [23] at 4.

Moreover, the Government argues that even if *Bruen's* standard applies, Section 922(g)(1)'s prohibition on felons possessing firearms is consistent with our historical tradition. *See* ECF No. [39] at 4–7. In support of its argument, the Government cites to various sister circuit cases that have indicated that limitations on felons' civic rights, as well as the right to bear arms, have existed throughout history. *See id.* The Government also cites to treatises that support its argument that "[s]ome classes of people were 'almost universally excluded' from exercising certain civic rights, including 'the felon, on obvious grounds.'" *Id.* at 4 (citation omitted).

Finally, the Government notes that none of the courts to have considered constitutional challenges to Section 922(g)(1) following *Bruen* have found the provision unconstitutional. ECF Nos. [23] at 5 (citing cases); [39] at 7–9 (citing cases). Indeed, the Government filed a Notice of Authority after the Third Circuit Court of Appeals' decision in *Range*, the first published circuit court ruling addressing the constitutionality of Section 922(g)(1) post-*Bruen*. *See* ECF No. [49]. *Range* found that felons are not among "the people" protected by the Second Amendment, but even if they were, "pertinent historical periods were replete with laws relevantly similar to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Id.* (quoting *Range*, 2022 WL 16955670, at *1, *6).

In response, Defendant maintains that the *Bruen* analysis applies to this case because the Supreme Court "explicitly rejected" the means-end scrutiny test for constitutional challenges to firearms regulations used by "*all* of the courts of appeals in the wake of [*Heller*]." ECF No. [27]

at 1 (emphasis in original).  Defendant notes that the Eleventh Circuit in *Rozier* "indeed applied the means-end scrutiny[,]" contrary to the Government's contention that Eleventh Circuit precedent remains controlling, and therefore, it is no longer binding precedent.  *See* ECF No. [44] at 1.  As to the Government's reliance on *Heller*, Defendant contends that *Heller's* "longstanding prohibition" language, which the Government cites to in support of its argument that felons are not of "the people," is dicta that is not entitled to "talismanic effect," particularly given that "felon-disarmament laws are *not* 'longstanding' in the sense that *Bruen* would use that term."  ECF No. [27] at 9 (emphasis in original); *see also id.* at 4–12.  Defendant argues that the Government's characterization that *Bruen* only applies to law-abiding citizens because it references law-abiding citizens several times is not persuasive because "courts simply do not read Supreme Court opinions through a process of negative implication" and the references are included because "the only question in *Bruen* concerned whether New York's proper-cause requirement infringed 'law-abiding' citizens' right to bear arms[.]"  *Id.* at 15.

    As to the other district courts that have considered the issue at hand, Defendant argues that the Government cites to a handful of district court cases which have "made mistakes at the Step Two phase of the *Bruen* inquiry" though some district courts "have at least agreed with Mr. Pierre at Step One" that felons are among the people.  *See id.* at 27–28.  Defendant also notes that at least one court has found a provision of Section 922 to be unconstitutional, and correctly "drew a careful distinction between a defendant's 'conduct'—the only relevant consideration after *Bruen*—and the defendant's status or category."  *Id.* at 29 (citing *United States v. Quiroz*, No. 22-cr-00104, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022)).

    Finally, Defendant maintains that the Government has not rebutted Section 922(g)(1)'s presumption of constitutionality.  Specifically, Defendant attacks the Government's use of

"analogical" reasoning in finding a basis in the historical references for the felon firearm ban because the issue of felons possessing guns existed at the time of the founding, and therefore, the Government must rely on "a 'distinctly similar' historical regulation."  ECF No. [44] at 4; *see also id.* at 2–12.  Here, Defendant argues that a "'distinctly similar' historical regulation would be one that either denied or substantially abridged *all felons'* access to firearms[,]" which the Government cannot show existed.  *See id.* at 4 (emphasis in original).  Defendant also argues that the Government's citations to the limitations of the rights of felons are irrelevant because they concern limitations to *civil* rights and not to a felon's *constitutional* right to bear arms.  *See id.* at 11–12.

### III.  ANALYSIS

An indictment "may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial."  *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).  The indictment's allegations are assumed to be true and are viewed in the light most favorable to the government.  *See id.*  Additionally, "[t]he sufficiency of a criminal indictment is determined from its face."  *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).  A defendant may move to dismiss an indictment pursuant to Federal Rule of Criminal Procedure 12(b), including for failure to state an offense, lack of jurisdiction, or constitutional reasons.  *See United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012).

### A.  The Court Is Required To Apply The Text And History Framework As Clarified in *Bruen* In Analyzing Defendant's Challenge To Section 922(g)(1).

As discussed above, following *Bruen*, courts analyzing whether a law regulating firearms is constitutional must first begin with the threshold question of whether the plain text of the Second Amendment applies.  *Bruen*, 142 S. Ct. at 2126.  If it does, the conduct is presumptively protected, and the Government "must demonstrate that the regulation is consistent with this Nation's historical

13

tradition of firearm regulation." *Id.* Specifically, in evaluating whether a regulation is consistent with the country's historical tradition, courts shall determine whether analogous regulations are "relevantly similar" by looking at "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

Before examining the text of the Second Amendment, the Court will address the Government's argument that *Bruen* left the Eleventh Circuit's decision in *Rozier* intact such that the Court need not even engage in the text and history analysis required by *Bruen*. *See* ECF No. [39] at 2–4. The Eleventh Circuit has made clear that a Circuit decision is "binding . . . unless and until it is overruled or undermined to the point of abrogation by the Supreme Court . . . ." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citing *Smith v. GTE Corp.,* 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)). Of course, such an intervening decision by the Supreme Court "must be clearly on point" in order to overrule Circuit precedent. *Id.* (quoting *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.,* 344 F.3d 1288, 1292 (11th Cir. 2003)).

The Parties dispute whether the Eleventh Circuit in *Rozier* applied the means-end analysis rejected in *Bruen*. To be sure, the means-end analysis in evaluating a firearm regulation was expressly rejected by *Bruen* and any case using such a test would be undermined to the point of abrogation. *See Bruen*, 142 S. Ct. at 2125–26. Indeed, "where the Supreme Court has clearly set forth a new standard to evaluate" a legal issue, prior Circuit precedent addressing that issue "has been undermined to the point of abrogation and [courts within the Eleventh Circuit] are thus bound to follow th[e] new rule of law." *Archer*, 531 F.3d at 1352.

It does not appear, based on the undersigned's reading of the opinion, that the Eleventh Circuit used the means-end test in *Rozier*. *See also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1052–53 (11th Cir. 2022) (Newsom, J., concurring) ("[W]e have never applied means-ends scrutiny

in a published decision analyzing a Second Amendment challenge. . . . [T]he important point for present purposes is that we've never applied the second step—only imagined it. And because we've never applied it in the past, I don't think we'd be obliged to do so in the future, should the issue squarely present itself.").   There is simply no language or passage in the opinion that could be interpreted as a means-end analysis, and the Court does not find it in the opinion.

However, that does not lead to the conclusion, as the Government advances, that nothing more is required of this Court.   *Bruen* definitively pronounced the standard by which any gun regulation must now be evaluated, a standard that the Supreme Court may have begun articulating in *Heller* (which was decided before *Rozier*)*, but that it did not finish articulating until *Bruen* (which was decided twelve years after *Rozier)*.   In its relatively short analysis of the constitutionality of Section 922(g)(1), the Eleventh Circuit in *Rozier* did not apply the now-required text and history approach of *Bruen*.   Although it relied on *Heller*, it did not make any determination as to whether a felon was part of "the people" as set out in the plain text of the Second Amendment, nor did it undertake any analysis of the historical record at the time of the founding.   Given that *Bruen* unequivocally mandates courts to apply the text and history standard, the Court is required to do so now.   The Court cannot, as the Government urges it to do, simply rely on *Rozier* and ignore *Bruen*.

In addition, the Government also relies on *In re Felix*, No. 22-12661-J, 2022 U.S. App. LEXIS 23434, at *1 (11th Cir. Aug. 22, 2022), to argue that the Eleventh Circuit has already addressed *Bruen*.   ECF No. [23] at 4–5.   However, *In re Felix*, an unpublished opinion, is not applicable because it arose from a successive Section 2255 motion and the Court made no finding or even comment as to the substantive issue, the constitutionality of Section 922(g)(1).   There, the movant sought to raise a successive motion under Section 2255, arguing that "his conviction under 18 U.S.C. § 922(g) violates his constitutional right to keep and bear arms for self-defense" and his

"claim relies on a new, intervening rule of constitutional law," arguing that *Bruen* "announced a change in constitutional law regarding 'the citizen's fundamental right to carry a handgun for self[-]defense.'" *In re Felix*, 2022 U.S. App. LEXIS 23434, at *4. Because the standard for granting a successive motion under Section 2255 requires either "(1) [n]ew substantive rules; or (2) a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding", the Eleventh Circuit denied the motion, reasoning that "*Bruen* did not establish either a new substantive rule of constitutional law or a watershed rule of criminal procedure for purposes of § 2255(h)(2)." *Id.* at *5, *7 (quoting *In re Hammoud*, 931 F.3d 1032, 1037 (11th Cir. 2019)). Indeed, the decision specifically noted that "the Supreme Court addressed the right to possess a handgun for self-defense purposes, not the constitutionality of convictions for possessing a firearm as a felon." *Id.* at *7. In short, *In re Felix* is not dispositive of the issue before the Court, nor does it suggest that the Court should not undertake the *Bruen* analysis.

Accordingly, because *Bruen* clearly sets out the analysis that courts must now follow in reviewing gun regulations, the undersigned proceeds to apply that standard to determine whether Section 922(g)(1)'s prohibition of felons possessing firearms is constitutional.

### 1. Defendant's Possession Of A Firearm Falls Within The Plain Text Of The Second Amendment.

To determine whether a firearm regulation offends the protections provided for by the Second Amendment, courts must first look to the Second Amendment's plain text to determine whether it protects that individual's conduct. *See Bruen*, 142 S. Ct. at 2126. The text of the Second Amendment reads, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The only application of the text that the Parties dispute is "of the people"—Defendant contends, as noted above, that he is "of the people" as the plain language makes no limitation for felons or otherwise.

16

The Government relies on its argument that *Heller* and *Rozier* are dispositive, but also responds that "of the people" only includes "law abiding citizen[s]", citing to the fact that the term "law abiding" is mentioned "*twelve* times in the *Bruen* majority opinion".  ECF No. [23] at 3 (quoting *Bruen*, 142 S. Ct. at 2134).  According to the Government, this language in *Bruen* resolves the issue because felons are not law-abiding citizens, and therefore, are not "of the people".  *See* ECF No. [39] at 1–3.

The Government's position is unpersuasive.  As the Government acknowledges, "*Bruen* dealt with the constitutionality of a law that restricted two 'law-abiding' citizens who applied for an unrestricted license to carry a handgun in public in New York."  ECF No. [23] at 3.  Thus, it is no surprise that the Court used the term "law-abiding" because that was the factual scenario the Court was considering.  Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether *non*-law-abiding citizens were part "of the people."  It did not, and *Bruen's* references to "law abiding" do not support the Government's position.

The Government also relies on the passage in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ."  *See Heller*, 554 U.S. at 626.  As an initial matter, that language in *Heller* is dicta.  *See United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("Dicta in *Heller* states that the opinion should not 'be taken to cast doubt on long-standing prohibitions on possession of firearms by felons . . . .'") (citation omitted).  *But see Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting on other grounds) (describing *Heller's* approval of felon-disarmament laws as "dicta" but suggesting that felons might be outside the scope of the

Second Amendment altogether).[2]  Indeed, because *Heller* had no occasion to consider the rights of felons, it cannot be said that that language was necessary to its opinion.  *See United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us[.]") (citation and quotations omitted); *United States v. Caraball-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.") (citation omitted).  Instead, a fair reading of *Heller* makes clear that the cited language was meant to emphasize the *limitations* of the decision, not to address the rights of another category of persons that were never considered nor needed to be considered in reaching the Court's decision.  One need not go any further than *Heller* itself to conclude that *Heller* did not address the felon firearm ban.  Justice Scalia, in writing for the majority, specifically noted that there would "be time enough to expound upon the historical justifications for the exceptions . . . if and when those exceptions come before us."  *Heller*, 554 U.S. at 635.  If any argument as to the scope of the Second Amendment's text can be made based on *Heller*, it is that the plain language of the Second Amendment covers Defendant.  *Heller* explained that there is a "strong presumption" that the plain text of the Second Amendment refers "to all members of the political community, not an

---

[2] Other courts before and after the *Bruen* decision have also recognized that this language in *Heller* is dicta.  *See United States v. Quiroz*, —— F. Supp. 3d —— , 2022 WL 4352482, at *5 (W.D. Tex. Sept. 19, 2022) (noting that "Heller's endorsement of felon-in-possession laws was in dicta"); *United States v. Ingram*, No. 18-cr-00557, 2022 WL 3691350, at *2 (D.S.C. Aug. 25, 2022) (acknowledging that *Heller's* statements that "the right secured by the Second Amendment is not unlimited" and that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felon" was dicta); *Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 837 F.3d 678, 686–87 (6th Cir. 2015) (refusing to give "conclusive effect" to the *Heller* dicta when analyzing the constitutionality of Section 922(g)(4)); *United States v. Skoien*, 614 F.3d 638, 639–40 (7th Cir. 2010) (en banc) (describing the "longstanding prohibitions" language as "precautionary" only, and "not dispositive"); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing the "longstanding prohibitions" language in Heller as "the opinion's *deus ex machina* dicta").

unspecified subset[,]" which is the "unambiguous[]" meaning of the term in "all six other provisions of the Constitution that mention 'the people[.]'" *Id.* at 580–81; *see also id.* at 580 ("'[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that 'the people' . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.") (citation omitted).

The undersigned finds that based on its plain text, Defendant is included in the Second Amendment's "of the people," as there is no qualification in the text that would serve to exclude him. *See United States v. Price*, No. 22-cr-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022) ("The plain text of the Second Amendment does not include a qualification that Second Amendment rights belong only to individuals who have not violated any laws.") (quotations and citation omitted); *United States v. Jackson*, No. 22-cr-00059, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022) ("This Court declines to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not violated any laws."). The Supreme Court has instructed that courts be "guided by the principle that '[t]he Constitution was written to be understood by the voters[,]" that is, how the words would have "been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77. Indeed, at the time of ratification, founding-era dictionaries defined "people" as encompassing the entire political community. *See* THOMAS DYCHE & WILLIAM PARDON, A NEW GENERAL ENGLISH DICTIONARY (14th ed. 1771) ("signifies every person, or the whole collection of inhabitants in a nation or kingdom"). Additionally, to define "the people" otherwise would produce absurd results because, as the Court noted in *Heller*, the term applies across the various provisions of the Constitution in which it is used. *See Heller*, 554 U.S. at 579–80. Indeed, a reading of "the people" that excludes felons from Second

Amendment rights might also lead to an exclusion of other constitutional rights, such as First Amendment rights, that are afforded to "all the people."

This reading of the Second Amendment's plain text was also advanced by the Eleventh Circuit, albeit in a different context.  In *Jimenez-Shilon*, the Eleventh Circuit considered whether immigrants without lawful status were part "of the people."  *See* 34 F.4th at 1044–46.  In doing so, the Court noted that "as both the Supreme Court and this Court have observed, even individuals who are indisputably part of 'the people,' such as dangerous felons and those suffering from mental illness, might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment."  *Id.* at 1046 (citing *Heller*, 554 U.S. at 626, 635); *see also United States v. Meza-Rodriguez,* 798 F.3d 664, 672 (7th Cir. 2015) (holding that persons without authorized immigration status were protected by the Second Amendment, finding that "we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded").  Accordingly, the undersigned finds that Defendant is part "of the people" protected by the plain language of the Second Amendment. Whether Defendant is otherwise prohibited from partaking in that pre-existing right is determined by the next question: Does the prohibition of possessing a firearm as a felon comport with our historical tradition of firearm regulation?[3]

---

[3]  Considering the historical review in determining the meaning of the plain text would not yield a different result, as noted below.  In addition, separating the two issues and considering the historical references in the second part of the analysis, is more consistent with the analysis that was conducted by the Supreme Court in *Bruen*.  *See also Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting) (noting that there are "competing ways of approaching the constitutionality of gun dispossession laws," one that finds certain people fall outside the groups of people, and one "that maintain[s] that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right" . . . . Although both "approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it

### 2.   Prohibiting Felons From Possessing Firearms Is Consistent With The Historical Tradition Of The Nation's Firearm Regulations.

Given that Defendant's possession of a firearm falls within the plain language of the Second Amendment, it is now the Government's burden to demonstrate that prohibiting Defendant from possessing a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  As an initial matter, the undersigned notes that the Government's Response did not meaningfully address this issue.  *See* ECF No. [23].  In its Sur-Reply, the Government addresses its burden primarily by citing to other district court decisions outside this Circuit.  *See* ECF No. [39] at 4–7.  Ultimately, however, the Government seeks to meet its burden by relying on the Third Circuit's historical analysis in *Range*.  *See* ECF No. [49].  Defendant responds that *Range* is not final, non-binding, and simply wrong.  *See* ECF No. [52].

Before reviewing the historical references relied upon by the Government, the Court must first address the issue at the heart of Defendant's response to *Range*, an issue Defendant advanced in his Motion: what *kind* of historical reference is sufficient for the Government to meet its burden. Specifically, must the historical support for the regulation at issue be "relevantly similar" to the restriction at hand, such that analogical reasoning is permissible, or, as the Defendant argues, must the historical support meet the more demanding standard of being "distinctly similar" to a regulation from the founding era?  *See* ECF No. [52] at 11–12.  Defendant argues that the "relevantly similar" standard which permits analogical reasoning is only permissible "where the problem addressed by the 'regulation at issue' was 'unimaginable' at the [f]ounding[.]"  *Id.* at 11.  If the problem was one that was present at the time of the founding, Defendant argues that analogical reasoning is not

---

away . . .the latter is the better way to approach the problem."), *abrogated by Bruen*, 142 S. Ct. at 2111.

permitted, and the Government can only meet its burden by finding a regulation in the founding era that is "distinctly similar" to the ban found in Section 922(g)(1).  *Id.* at 11–12.

The Court need only look to *Bruen* to resolve this question and in doing so does not find support for Defendant's position.   In *Bruen*, the Court laid out how the Nation's historical understanding of firearms regulations might be measured by noting that:

> [i]n some cases, that inquiry will be fairly straightforward.  For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.  Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.  And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2131.  Defendant reads this language as creating a distinction between "relevantly similar" and "distinctly similar."  *See* ECF No. [52] at 11–12.  Although the Court sought to explain how the historical record might be measured under various scenarios, it did not, at least not by this Court's reading, create a different standard if the problem addressed by the regulation is one that existed at the time of the founding.  Indeed, in describing the Court's review of the historical record in *Heller*, Justice Thomas in *Bruen* noted that the societal problem, "firearm violence in densely populated communities[,]" was a problem that could have been addressed by the Founders, and then described the Court's review of the historical record as one that yielded no laws that were "analogous" to the regulation at issue in *Heller*.  *See Bruen*, 142 S. Ct. at 2131.  The Court went on to explain that two of the metrics that courts should consider in reviewing whether historical understanding of a regulation is "relevantly similar" includes "how and why the

regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133.  In doing so, the Court made clear that:

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. . . . [A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (emphasis in original).  Given this language, this Court finds no support in *Bruen* (and no other support is provided by Defendant) for a "distinctly similar" analysis being *required* in evaluating the historical understanding of limitations on a felon's right to possess a firearm.  Instead, the Supreme Court's language provides guidance when the issues at hand involve "modern regulations that were unimaginable at the founding[,]" noting that reasoning by analogy requires a court to review whether the historical context is *relevantly similar*.  *Id*. at 2132.  Moreover, whether the *regulation* was unimaginable at the founding is different than whether the *societal problem*, as Defendant posits in his Motion, was unimaginable.  *See* ECF No. [16] at 10–11.  Indeed, the Court in *Bruen*, as it did in *Heller*, combed the historical record in search of analogous regulations, and in each case found no examples that were similar to either the ban on weapons in the home reviewed in *Heller* or the subjective limitations placed by New York's open carry law in *Bruen*.  *See Heller*, 554 U.S. at 628–34; *Bruen*, 142 S. Ct. at 2138.

Instead, the Court must consider whether there is "a well-established and representative historical analogue" to the limitation on felons possessing firearms as found in Section 922(g)(1)— specifically, whether Section 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126, 2133 (emphasis removed).  That is all that is required.  Although various district courts in other circuits have analyzed this issue, the Parties did

not identify (and the Court did not find) any district court in this Circuit to have considered the constitutionality of Section 922(g)(1) in a written opinion since *Bruen*, and the Third Circuit Court of Appeals is the only Circuit to issue a published opinion on the matter to date.[4]  Although the Government encourages the Court to simply follow these other district courts, such an argument is unhelpful not only because those opinions do not bind this Court, but also because the other district courts that have found the ban to be constitutional have done so based on a variety of different reasons.[5]  In short, encouraging this Court to follow the pack, when the pack is going down different paths (albeit to reach the same result), is not an argument the Court finds particularly persuasive.

---

[4]  It should also be noted that the Seventh Circuit Court of Appeals recently (and swiftly) denied an as-applied challenge to Section 922(g)(1), noting that they were not aware of any authority supporting an argument that a violent felon "historically had the right to possess a gun.  Thus, it would be frivolous to argue that Section 922(g)(1) is unconstitutional as applied to [the defendant]." *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022).

[5]  Indeed, those district court decisions to date fall loosely under at least six categories.  First, a number of courts concluded that a felon is part of "the people" but that the ban is consistent with the Nation's historical tradition of gun regulation.  *See United States v. Carrero*, No. 22-cr-00030, ⸺ F. Supp. 3d ⸺, ⸺, 2022 WL 9348792, at *3 (D. Utah Oct. 14, 2022); *United States v. Coombes*, No. 22-cr-00189, ⸺ F. Supp. 3d ⸺, ⸺, ⸺, 2022 WL 4367056, at *8, *11 (N.D. Okla. Sept. 21, 2022); *United States v. Charles*, No. 22-cr-00154, ⸺ F. Supp. 3d ⸺, ⸺, 2022 WL 4913900, at *11 (W.D. Tex. Oct. 3, 2022);  *United States v. Collette*, No. 22-cr-10041, ⸺ F. Supp. 3d ⸺, ⸺, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022).  Second, some courts determined that the plain text of the Second Amendment covers the conduct at issue, but conducted no historical analysis, simply finding that the provision is constitutional on the grounds that such a holding is consistent with precedent from those courts.  *See United States v. Price*, No. 22-cr-00097, ⸺ F. Supp. 3d ⸺, ⸺, 2022 WL 6968457, at *9 (S.D.W. Va. Oct. 12, 2022); *United States v. Cockerham*, No. 21-cr-00006, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022).  Third, some courts have found that the challenge is precluded by precedent, an even if it were not, the challenge would fail under the *Bruen* analysis, as the conduct is not protected by the Second Amendment's plain text, *see United States v. Trinidad*, No. 21-cr-00398, 2022 WL 10067519, at *3 (D.P.R. Oct. 17, 2022),  and also would fail because prohibition of felons from possessing firearms is consistent with historical tradition, *see United States v. Young*, No. 22-cr-00054, 2022 WL 16829260, at *11 (W.D. Pa. Nov. 7, 2022); *United States v. Riley*, No. 22-cr-00163, ⸺ F. Supp. 3d ⸺, ⸺, ⸺ ⸺, 2022 WL 7610264, at *10, *13 (E.D. Va. Oct. 13, 2022).  Fourth, two Southern District of California courts found that the firearm prohibition on felons is consistent with precedent and consistent with historical tradition.  *See United States v. Hill*, No. 21-cr-00107, ⸺ F. Supp. 3d ⸺ ⸺, ⸺, 2022 WL 4361917, at *3 (S.D. Cal. Sept. 20, 2022); *United States v. Ridgeway*, No. 22-

The Court will now turn to the historical record provided by the Government in its Sur-Reply, ECF No. [39], and by the Third Circuit in *Range*, which the Government adopted, ECF No. [49].[6]  For the reasons noted below, the undersigned finds the Third Circuit's reasoning in *Range* to be comprehensive and persuasive, and adopts it herein.  First, the Government and the court in *Range* each cite to sources before colonial America.  That analysis supports the Government's reading that the historical record supports the ban in Section 922(g)(1).  The Supreme Court has made clear that the rights enshrined in the Second Amendment are "pre-existing" and, therefore, history from the late 1600's as well as American colonial times are instructive in determining the relevant historical references.  *See Bruen*, 142 S. Ct. at 2127; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original).  In *Bruen*, the Court cautioned that courts may "reac[h] back" to earlier time periods to recognize whether practices continued "up to the 'period immediately before and after the framing of the Constitution[,]'" but otherwise, historical evidence arising long before the Nation's founding may be less relevant to understanding

---

cr-00175, 2022 WL 10198823, *2 (S.D. Cal. Oct. 17, 2022).  Fifth, other courts have found that *Bruen* does not disturb prior precedent and *Bruen* and/or prior precedent forecloses a finding that the provision is unconstitutional, without engaging in the *Bruen* analysis.  *See United States v. Raheem*, No. 20-cr-00061, 2022 WL 10177684, at *3 (W.D. Ky. Oct. 17, 2022); *United States v. Siddoway*, No. 21-cr-00205, 2022 WL 4482739, at *2 (D. Idaho Sept. 27, 2022); *United States v. Jackson*, No. 21-cr-00051, 2022 WL 4226229, at *3 (D. Minn. Sept. 13, 2022); *United States v. Ingram*, No. 18-cr-00557, —— F. Supp. 3d ——, ——, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022); *United States v. Minter*, 22-cr-00135, 2022 WL 10662252, at *4 (M.D. Pa. Oct. 18, 2022).  Finally, one court summarily denied a motion to dismiss, given that other courts have rejected such a challenge.  *See United States v. Burrell*, No. 21-cr-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022).

[6] *Bruen* made clear that it is the burden of the party seeking to impose a regulation to demonstrate that such regulation of firearms is consistent with the historical tradition of the United States.  *See Bruen*, 142 S. Ct. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute.  That is respondents' burden.").

the scope of the right as it was understood at the time of ratification.  *Id.* at 2136 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 311 (2008) (Roberts, C. J., dissenting)).  The Third Circuit found that "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws."  *Range*, 2022 WL 16955670, at *8.  In 1689, England disarmed Catholics because at that time, "[d]isavowal of religious tenets" demonstrated "a disregard for the legally binding decrees of the sovereign."  *See id.* at *8.

During the colonial period, "[d]ating back to 1637, the Massachusetts colony enacted a law that required named individuals who expressed 'opinion & revelations,' that seduced [and] le[d] into dangerous errors many of the people' of New England to turn in all 'guns, pistol, swords, powder, shot & match.'"  *United States v. Young*, No. 22-cr-00054, 2022 WL 16829260, at *8 (W.D. Pa. Nov. 7, 2022) (citing Eric M. Ruben and Darrell A. H. Miller, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 72 (2017)).  In *Range*, the court specifically noted that the Massachusetts Bay Government "disarmed at least fifty-eight of [an outspoken preacher's] supporters[.]"  2022 WL 16955670, at *9 (citing James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988)).  Additionally, "Maryland—as well as Virginia and Pennsylvania—confiscated firearms from their Catholic residents during the Seven Years' War[.]"  *Id.* (citing Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 574 (1998)); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020)); *Heller*, 554 U.S. at 582 ("William Blackstone, for example, wrote that Catholics convicted of not

attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to 'keep arms in their houses.'") (citing 4 COMMENTARIES ON THE LAWS OF ENGLAND 55 (1769)).  Additionally, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citing Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008)).  Indeed, Massachusetts disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 908 (3d Cir. 2020), *cert. denied sub nom. Folajtar v. Garland*, 209 L. Ed. 2d 546 (2021) (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)).

The Court in *Bruen* also recognized the usefulness of post-enactment history, also considered by the Court in *Range*.  While the Supreme Court has cautioned "against giving postenactment history more weight than it can rightly bear[,]" it also noted that evidence regarding "how the Second Amendment was interpreted" immediately post-ratification can be a "critical tool of constitutional interpretation." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605).  Post-enactment history concerning prohibiting felons from possessing firearms is consistent with the Court's foregoing analysis.  Indeed, "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' . . . and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . .'" *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 LAW & CONTEMP. PROBS. 143, 146 (1986)); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 TENN. L. REV. 461, 480 (1995)

(noting that felons "were excluded from the right to arms" because they were "deemed incapable of virtue"). Accordingly, "[f]elons 'were excluded from the right to arms' because they were deemed unvirtuous." *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (quoting Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. at 480)).

Because the Government need only show a well-established and representative historical analogue, it has met its burden by showing that there were various limitations to the right to bear arms connected to the idea of virtuous citizenry. The analogues provided above are sufficient to support the argument that the felon firearm ban, as written today, is supported by our Nation's historical tradition of firearm regulation. Indeed, these analogues are well-established and show that at the time of the founding, the government restricted the right to possess firearms for categories of persons who were not considered "virtuous" or who otherwise failed to abide by certain laws. These examples are representative, historical analogues to the restriction at issue here, which bans felons (members of society who have failed to abide by certain laws) from possessing firearms.

Defendant argues that even if the Third Circuit correctly applied the "relevantly similar" standard, the laws identified in the Third Circuit's historical analysis are not in fact "relevantly similar" to Section 922(g)(1). *See* ECF No. [52] at 12–14. According to Defendant, the pre- and post-colonial laws relied on in *Range* are not "relevantly similar" to Section 922(g)(1) because those laws "did not 'impose a comparable burden on the right of armed self-defense.'" *Id.* at 13 (citing *Bruen*, 142 S. Ct. at 2133). Defendant argues that the state laws "endured only as long as someone declined to declare loyalty to the state[,]" as opposed to a permanent deprivation of a Constitutional right. *Id.* Additionally, Defendant attempts to draw a distinction between the historical analogues and the provision at issue here by arguing that Section 922(g)(1) "seeks to prevent interpersonal violence by people previously convicted of a crime" whereas the historical

statutes "were meant to neutralize those 'considered dangerous to the *state* [.]'" *Id.* Defendant's arguments call for a level of similarity between Section 922(g)(1) and our historical traditions that is not required.  The fact that some of the historical examples limited the rights of people who threatened the state might address "why" their rights were limited, but their rights were limited for any purpose.  Indeed, someone deemed a threat to the state was also not allowed to possess a firearm for their protection.  These references are persuasive because they took an entire group of people (the unvirtuous) and stripped them of their right to possess a firearm for any reason.

Although *Bruen* points us to the "how and "why," it also advises that there need not be an exact analogue to restricting the rights of felons, or even a particular kind of felon (including dangerous versus not dangerous).  The issue is not whether there were laws disarming felons at the time of the founding in the exact manner that Section 922(g)(1) disarms felons.  Indeed, if that were the inquiry, the decision would be quite simple because the standard could never be met, as an all-felon ban does appear to be of the twentieth century vintage.  The issue is whether there are relevantly similar, analogous examples from the founding that the Court can rely on to find that today's ban in Section 922(g)(1) is consistent with the historical limitations on the Second Amendment.  While Defendant seeks to minimize the historical analysis conducted by the Third Circuit, the pre-colonial, colonial, and post-colonial evidence confirms that there were several, well-established instances of disarming non-virtuous citizens at the time that the Second Amendment was ratified.  These examples are sufficient to show that there was a tradition of limiting the possession of firearms for classes of citizens based on conduct that was unvirtuous. Because the specific question that *Bruen* dictates we resolve is whether the present felon firearm ban is "consistent with the Nation's historical tradition of firearm regulation[,]" and given that our historical tradition of firearm regulation included limitations for those that, although part of the

polity, failed to abide by the rules of a civil society, the historical analysis is met. These historical references, as *Bruen* dictates, are "well-established and representative historical analogue[s]." They are not "historical twin[s,]" but they need not be. *See Bruen*, 142 S. Ct. at 2133 (emphasis removed).

## IV.    CONCLUSION

For the reasons set forth above, it is hereby **RECOMMENDED** that Defendant's Motion, ECF No. [16], be **DENIED**.

## IV.    OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, by **Wednesday, November 30, 2022 at 12:00 p.m.** The parties were given ample time to argue their positions at the Hearing, as well as the opportunity to submit supplemental briefing. The last brief on the matter was submitted on November 23, 2002. The shortened period will allow for the District Court to consider the matter before the Calendar Call now set for December 1, 2022. Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions. *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on November 28, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**